UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER EVERETT, ) | |
| ) | |
| Plaintiff, ) | No. 1:20-CV-02465 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| WEXFORD HEALTH SOURCES, INC., ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Christopher Everett, an inmate at Stateville Correctional Center, brought this civil-rights lawsuit, 42 U.S.C. § 1983,[1] against Wexford Health Sources, Inc.; the Director of the Illinois Department of Corrections (IDOC), Robert Jeffreys; and the warden of Stateville, David Gomez. R. 29, Am. Compl.[2] Everett claims that the Defendants were deliberately indifferent to his serious medical needs by preventing him—through their rules, policies, practices, or customs—from accessing bottled water that had been prescribed to help treat his illnesses. *Id.* ¶¶ 82–104. Wexford filed a motion to dismiss the deliberate-indifference claim against it for failure to adequately state a claim. Fed. R. Civ. P. 12(b)(6); R. 47, Mot. Dismiss. For the reasons explained in this Opinion, Wexford's motion to dismiss is denied.

---

[1]This Court has subject-matter jurisdiction over this federal-question case under 28 U.S.C. § 1331.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

## I. Background

For this motion, the Court accepts all well-pleaded allegations as true and draws all reasonable inferences in Everett's favor. *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). Everett has been an inmate at Stateville, an IDOC prison, since 2003. Am. Compl. ¶ 5. Wexford, an IDOC contractor, provides health care and medical treatment to Stateville inmates. *Id.* ¶¶ 6, 20. Together, Wexford, Stateville, and the IDOC promulgate, implement, and maintain rules, policies, practices, and customs (for convenience's sake, this Opinion generally will refer to all of those things as "policies") that have affected Everett during the period relevant to his allegations—2018 to the present. *Id.* ¶¶ 20, 28–81, 87.

Everett suffers from "continuing and chronic muscle and nerve pain, cramping, fatigue, sleep deprivation, elevated creatine kinase (CK) levels and corresponding increased risk of kidney damage, and other related complications." Am. Compl. ¶ 1. To treat his medical conditions, Everett was referred by onsite prison doctors to offsite specialists on three occasions in August 2018, August 2019, and June 2021. *Id.* ¶¶ 31, 62, 73. Everett received three separate bottled-water prescriptions following these visits. *Id.* ¶¶ 33, 64, 75. The initial 2018 prescription directed him to "limit water intake to bottled water only." *Id.* ¶ 33. The 2019 one prescribed half-a-gallon of bottled water per day, noting the critical importance of staying hydrated. *Id.* ¶ 64. An onsite prison doctor acknowledged the 2019 prescription by advising that Everett be given three to four water bottles per day and 90 to 100 water bottles per month. *Id.*

¶ 65. The last prescription issued in 2021 directed Everett to "increase water intake to 64 oz per day of bottled water including on weekends." Id. ¶ 75.

Stateville inmates, including those with medical prescriptions, access bottled water through the prison commissary. But visits to the commissary are neither guaranteed nor regular. Am. Compl. ¶¶ 14–15. Indeed, inmates typically receive fewer than two commissary visits per month. Id. ¶ 15. So-called "medical permits" have been used at Stateville to authorize and to document medical accommodations other than prescription medication. Id. ¶¶ 21–24. Between May and September 2018, bottled-water prescriptions were administered through these medical permits, which authorized inmates to purchase more water bottles at the commissary than normally allowed. Id. ¶¶ 24–26. In 2018, an inmate *without* a medical permit was allowed to purchase 24 bottles of water per commissary visit. Id. ¶ 36. That limit was raised to 35 bottles per visit in 2019. Id.

After receiving the first bottled-water prescription in August 2018, Everett was issued a corresponding commissary medical permit, valid from September 2018 to March 2019, that should have allowed him to buy an additional 24 bottles per visit on top of the usual 24-bottle maximum. Am. Compl. ¶ 35. Instead, Everett was still limited to the regular 24-bottle (and later 35-bottle) limits that applied to inmates without medical permits in 2018 and 2019. Id. ¶¶ 37–38. Without the extra bottles, Everett was unable to limit his water intake to only bottled water as directed by the 2018 prescription; he had to drink non-bottled water too. Id. ¶¶ 38–39. From October 2018 through February 2019, Everett submitted at least seven grievances to the

3

prison complaining about his inability to access sufficient bottled water. *Id.* ¶ 40. But each grievance was denied by Stateville's wardens. *Id.* ¶¶ 43–44. The denials asserted—despite Everett's 2018 prescription and corresponding medical permit—that Everett did not have authorization to buy extra water bottles. *Id.* ¶¶ 46–47.

Medical permits for bottled water were ultimately scrapped around November 2018. Am. Compl. ¶ 52. After the demise of medical permits, inmates were informed through different sources—Everett, for example, was told by onsite doctors and nurses—that they could purchase unlimited amounts of bottled water at their commissary visits. *Id.* ¶¶ 53–54, 56–59. According to Everett, however, the new professed policy did not reflect reality: inmates were not, in fact, allowed to make unlimited water-bottle purchases. *Id.* ¶ 55. And visits to the commissary continued to be irregular and infrequent. *Id.* From January 2019 to July 2021, Everett was unable to buy more than 35 bottles per commissary visit. *Id.* ¶ 69. Then, from August 2021 through January 2022, all inmates, including those like Everett with bottled-water prescriptions, were barred from buying *any* bottled water from the commissary. *Id.* ¶¶ 77–78. As of the filing of the amended complaint in April 2022, inmates were only allowed to buy between 10 to 12 bottles of water per commissary visit. *Id.* ¶ 81. Commissary visits continued to be infrequent; for instance, Everett visited the commissary only one time between February 10 and March 11, 2022. *Id.*

In short, since receiving his first bottled-water prescription in August 2018, Everett has never been unable to buy enough water bottles to satisfy his prescriptions' admonition to drink only bottled water. Am. Compl. ¶ 79.

4

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir.2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

III. Analysis

A. Group Pleading

Wexford first argues that dismissal is necessary because Everett engaged in "group" pleading, meaning that he lumped all the Defendants together in the pertinent allegations.[4] Mot. Dismiss at 5. But group pleading does not automatically require dismissal. *See, e.g.*, *Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013) (holding that the complaint was sufficient despite referring to "the defendants generally" because the complaint alleged that defendants acted together); *Heidelberg v. Manias*, 503 F.Supp.3d 758, 785 (C.D. Ill. 2020) (laying out case-law examples of acceptable group pleading). And civil-rights claims brought under Section 1983 are not subject to a heightened-pleading standard. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993). Indeed, when an alleged injury is caused by the combined actions of several parties, a plaintiff might not be able to attribute specific misconduct to a specific defendant without pretrial discovery, yet the plaintiff still has a good-faith basis to level allegations against the overall group. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821–22 (7th Cir. 2009). So, at the pleading stage, it is sufficient to state enough facts to put the defendants on notice of the claims against them without having to individualize every allegation.

---

[4]Earlier in its motion, Wexford also seems to argue—though the relevant section lacks any substantive argument and only includes a (partially flawed) compilation of *Monell* elements and caselaw—that Everett's complaint forecloses him from proving all the elements of *Monell* liability against Wexford. Mot. Dismiss at 3–4. But Everett is not required to *prove* anything at the pleading stage.

6

*See Brooks*, 578 F.3d at 582 ("Brooks adequately pleads personal involvement, because he specifies that he is directing this allegation at all of the defendants.").

Everett alleges that Wexford, Stateville, and IDOC together maintained policies that prevented him from fulfilling his bottled-water prescriptions. Am. Compl. ¶¶ 87–88. He specifically alleges that all of the Defendants, including Wexford, together maintained the following policies that caused him harm: the inconsistent issuance (or outright non-issuance) of medical permits for bottled water; the limits on the purchase of bottled water at the commissary; the infrequent and unpredictable commissary visits; the failure to provide special requests to visit the commissary; the requirement that inmates pay for their bottled water; the delegation to non-medical employees—like those in the commissary—of the authority to grant or deny access to bottled water; the failure to timely evaluate and respond to grievances about irregular access to bottled water; and, generally, the inconsistent, contradictory, and frequently changing procedures to access bottled water. *Id.* ¶ 87. There is nothing wrong with group pleading in this specific setting, that is, when a combination of action (or inaction) by each of the Defendants allegedly contributed to the lack of access to bottled water.

Relatedly, Wexford argues that Everett expressly pleaded that Wexford is only responsible for medical-care policies, suggesting that the amended complaint thus excuses Wexford of responsibility for whatever happens at the commissary. Mot. Dismiss at 5. But there are several problems with that argument. One, access to bottled water is—drawing reasonable inferences in favor of Everett—an element of medical

care, especially in the context of a prescription. Two, Everett never alleges that Wexford is *only* responsible for medical care and nothing else. *See* Am. Compl. ¶ 20 ("Wexford promulgates and implements rules, regulations, policies, procedures and customs for the medical care provided to inmates at Stateville, including Plaintiff."). And finally, Everett very clearly alleges that Wexford had a hand in maintaining the specific commissary policies that prevented him from fulfilling his prescriptions. *Id.* ¶ 87. That might not turn out to be factually correct later, but this is the pleading stage.

Returning to the core issue of group pleading, Everett sufficiently alleges that all of the Defendants acted in concert in the promulgation and maintenance of specific policies that caused the problem. *See Engel*, 710 F.3d at 710 (finding group pleading is permissible when all defendants are alleged to have acted jointly and "there is no genuine uncertainty regarding who is responsible for what"). From reading the amended complaint, Wexford knows exactly what policies it is accused of having orchestrated together with Stateville and IDOC. True, discovery might later reveal that some of the targeted policies were, in fact, promulgated and maintained by only one or two of the Defendants. For this motion, however, all reasonable inferences are drawn in favor of Everett, who alleges that Westford is at least partially responsible for each policy that caused his harm. To prepare its defense, Wexford has sufficient notice of which of its alleged policies are being accused of causing Everett's harm. And, again, if Wexford is not responsible for some of these policies, it has a chance to provide that evidence during discovery. Hence, the amended complaint does not fail for group pleading.

8

## B. Causation

Wexford next argues that the amended complaint lacks sufficient allegations to support an inference that Wexford's policies are the "driving force" behind any constitutional violation.[5] Mot. Dismiss at 6. But, in fact, Everett's sufficiently linked the repeated and persistent failures to fulfill his water bottle prescriptions to alleged Wexford policies. The "rigorous causation standard" of a *Monell* claim requires a "direct causal link" between the challenged action and the violation of rights. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). The complaint must plausibly suggest that Wexford's policies and not the individual action of some employees administering them caused Everett's constitutional deprivation. *Id.* at 239.

The amended complaint lists out the policies attributable to Wexford and its co-Defendants, including among others (and as already discussed) limits on the number of water bottles Everett could purchase per commissary visit; non-guaranteed and infrequent commissary visits; and inconsistent medical permit procedures. Am. Compl. ¶ 87. The Defendants and their employees allegedly acted in accordance with these flawed policies. *Id.* ¶ 89. Wexford identifies allegations in the amended

---

[5]In its reply brief, Wexford also argues that Everett cannot rely only on his own experience to plead the existence of a widespread policy or custom and that the amended complaint should be dismissed for that reason as well. R. 55, Def.'s Reply at 9–10. The Seventh Circuit, however, has explained that a plaintiff need not, as a matter of *law*, show in every single *Monell* case that the alleged unconstitutional policy caused harm to others in order to establish a widespread policy. *Davis v. Carter*, 452 F.3d 686, 695 (7th Cir.2006). More importantly, because Wexford failed to raise this issue in its opening motion to dismiss, the Court will not consider this argument because Everett did not have a chance to respond. *See Dexia Crédit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived.").

complaint by which Everett complains that "the Stateville commissary" did not allow him to purchase his prescribed water bottles. Mot. Dismiss at 6 (citing Am. Compl. ¶ 71). Wexford argues that such allegations demonstrate that Everett's pleaded that it was the commissary alone, and not Wexford policies, that harmed him. *Id.* But that is a cherry-picked argument. As explained, the amended complaint is full of the specific policies that allegedly made it impossible for Everett to access his prescription, including inconsistent and constantly changing directives and even periods when the policy was to completely bar inmates from purchasing any bottled water. *See, e.g.*, Am. Compl. ¶¶ 77, 87. Ultimately, a reasonable inference from a full reading of the amended complaint is that the policies of Wexford, Stateville, and IDOC—combined—governed the commissary and guided the behavior of those commissary employees who repeatedly denied Everett's bottled-water requests *because of* the policies purportedly set by of Wexford, Stateville, and IDOC.

So, even though Everett does not use the exact words "driving force"—he does not need to, notice pleading is not so formulaic or formalistic—to explain the effect that Wexford's policies had on his access to bottled water, he still sufficiently pleads that those policies are what prevented him from receiving his prescribed medical care, which caused a violation of his constitutional rights. And Wexford's final rhetorical flourish, asking why it would it issue or authorize medical prescriptions inconsistent with its policies, *see* Mot. Dismiss at 6, bears no relevance at the pleading stage on whether Everett stated a plausible cause of action. Allegations of subjective corporate

10

motive are not required for a *Monell* claim, and the amended complaint does not fail for not providing them.[6]

### C. Underlying Constitutional Violation

Finally, Wexford argues that the complaint fails because "no allegation[s] support a finding of a federal right[s] deprivation." Mot. Dismiss at 7. Wexford makes three points in support of this argument: that Everett failed to allege underlying deliberate indifference, that he does not allege an objectively serious medical condition or need, and that he did not sufficiently allege a violation of his rights because he did get bottled water, just not as much as he wanted. *Id.* at 7–11.

### 1. Underlying Deliberate Indifference

Wexford's first argument here is that the lack of allegations against an *individual* Wexford medical provider forecloses any finding of a federal-rights deprivation caused by Wexford. Mot. Dismiss at 8. But, as previously explained to Wexford, there is no absolute requirement in all *Monell*-liability cases that there be an individual who is liable on a deliberate-indifference claim. *See Smith v. Wexford Health Sources, Inc.*, No. 19-cv-5329, 2022 WL 2073011, at *3 (N.D.Ill. June 9, 2022) ("If institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible.") (cleaned up). Though Everett did not allege a deliberate

---

[6]Wexford cites *Montague v. Wexford Health Sources, Inc.*, 615 F. App'x. 378, 379 (7th Cir. 2015) in support of its inconsistent-motive argument. Mot. Dismiss at 6–7. But *Montague* is a summary judgment case and inapplicable at the pleading stage. Circumstantial evidence that Wexford would not benefit financially from denying water-bottled purchases, *Id.*, or that it would be illogical to promulgate policies it did not mean to honor, *Id.*, should be saved for summary judgment (or trial).

indifference claim against a Wexford provider, he can still state a federal-rights violation against Wexford by alleging, as he did, that "institutional policies are themselves deliberately indifferent." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021) (cleaned up). Going forward in this case and others, at the least Wexford ought to acknowledge that there is no absolute rule when it invokes this general principle and should make an argument specific to the particular case.

### 2. Objectively Serious Conditions

Wexford also argues that Everett failed to allege that he suffered from objectively serious medical conditions or needs. Mot. Dismiss at 8. But a serious medical condition can be one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (cleaned up). In Everett's case, he was referred by onsite prison doctors to offsite specialists on three occasions in August 2018, August 2019, and June 2021. Am. Compl. ¶¶ 31, 62, 73. Everett received three different bottled-water prescriptions from these offsite specialists. *Id.* ¶¶ 33, 64, 75. In short, Everett alleges that he was diagnosed by physicians with conditions mandating treatment, which consisted of drinking prescribed amounts of bottled water. Maybe discovery will reveal a lack of a serious condition, but this is the pleading stage. Everett sufficiently pleaded objectively serious medical conditions.[7]

---

[7]The Seventh Circuit has also held that chronic pain constitutes an objectively serious medical condition. *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). Here, Everett

### 3. Amount of Bottled Water Received

Lastly, Wexford argues that there is no federal-rights deprivation because Everett received bottled water, just not as much as he wanted. Mot. Dismiss at 10. This argument misunderstands what the law requires at the pleading stage. A refusal to provide an inmate with prescribed medication or to follow the advice of a specialist is generally sufficient to form the basis of an Eighth Amendment claim, at least at the pleading stage. *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011). Here, Everett received prescriptions that directed him to "limit water intake to bottled water only," then to drink half-a-gallon of bottled water per day. and finally to "increase water intake to 64 oz per day of bottled water including on weekends." Am. Compl. ¶¶ 33, 64, 75. In other words, specialists did not prescribe bottled-water consumption generally or vaguely; rather, they provided specific instructions on how much bottled water Everett needed to drink. True, according to the allegations Everett was able (sometimes) to purchase *some* bottled water. But he also clearly alleges that he was never able to purchase enough water bottles to satisfy the prescriptions. Id. ¶ 39, 67–72, 76–79. Because he alleges that he was denied the prescribed amount of bottled

---

alleges that he suffers from "continuing and chronic muscle and nerve pain, cramping, fatigue, sleep deprivation, elevated creatine kinase levels and corresponding increased risk of kidney damage, and other related complications." Am. Compl. ¶ 1. Though unnecessary given that doctors determined that he had conditions mandating treatment, Everett's alleged chronic pain could also satisfy the objectively serious medical-condition element.

water due to Wexford's policies, Everett has sufficiently stated a deliberate-indifference claim.

## IV. Conclusion

Wexford's motion to dismiss is denied. All of the parties shall confer on a discovery schedule (there was a probably-unnecessary pause, *see* R. 49) and file a joint status report with the proposal by April 14, 2023. Wexford also shall file its answer on April 14, 2023. The tracking status hearing of April 21, 2023, remains in place but no appearance is needed; the Court will set the discovery schedule based on a review of the status report.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 31, 2023